# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN GONZALES,<br><br>　　　　　　　　　Plaintiff,<br><br>　vs.<br><br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA, PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, and STARWOOD HOTELS & RESORTS LONG TERM DISABILITY PLAN & WORKPLACE DISABILITY PLAN,<br><br>　　　　　　　　　Defendants. | CASE NO. 09-CV-0468-AJB (WVG)<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE STANDARD OF REVIEW<br><br>[Doc. Nos. 51 & 55] |

Now before the Court are cross-motions for summary judgment to determine the appropriate standard of review on Plaintiff Ruben Gonzales' disability insurance claims pursuant to the Employee Retirement Income Security Act ("ERISA"). These motions were fully briefed in March 2011 before they were transferred to the undersigned. The Court found them suitable for decision on the briefs. Civ. Local R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion and holds that the de novo standard of review applies to the short-term disability policy, and **GRANTS** the motion filed by Defendants Unum Life Insurance Company of America, Provident Life and Accident Insurance Company, and Starwood Hotels and Resorts Long Term Disability Plan and Workplace Disability Plan that the abuse of discretion standard applies to the long-term disability policy.

## **BACKGROUND**

The parties agree that the de novo standard of review applies to the short-term disability (STD) policy; consequently, the Court describes only those facts pertaining to Gonzales' claim for long-term disability benefits (LTD).[1] The parties have not asked the Court to apply the standard of review to the facts, thus, a truncated version of facts suffices.

Gonzales worked as a team manager and leader selling timeshares for Starwood Hotels in Hawaii. He earned $550,000 in 2005 and over $395,000 in 2006. Starwood covered its employees with a group long-term disability policy from Unum Insurance Company. If benefits had been paid, Gonzales would have received a monthly benefit of $21,078.28 for the eighteen months following the expiration of his short-term disability benefits.

### **A. Gonzales' Claims for Benefits**

In June 2007, when Gonzales was 67 years old, he had a second heart operation to treat blocked arteries. (Gonzales had been treated for the same problem in 2005, thus, insurers deemed it to be a pre-existing medical condition.) On June 20, Gonzales called Unum, and the agent's intake form states that the condition was "blocked arteries." AR Ex. C at 29. Unum acknowledged Gonzales' claim for benefits, asked his doctors to complete a medical form, and asked Gonzales to provide a written statement. *Id.* at 89 (referring to STD benefits as "Voluntary Workplace Benefit").

On the written form, Gonzales listed his medical condition as "dizziness, anxiety, and fatigue[]." *Id.* at 95. Unum telephoned Gonzales on June 26, and Gonzales stated that

---

[1] As to the short-term disability policy it is sufficient to note that Gonzales bought an individual insurance policy from Provident Life and Accident Insurance Co., which is a subsidiary of Unum's parent corporation. AR Ex. D at PLACLVB 432-47 (policy issued by "Unum Provident"). The policy provides a $5,000 month benefit for six months. *Id.* at 434. Gonzales applied for short-term benefits and received them for five months (July 2007 through December 2007). AR Ex. E at 20-21, 216-17, 236-37. Provident later denied and closed Gonzales' short-term disability claim. *Id.* at 413.
   The parties agree that the policy does not grant any discretion to the insurance company. It is entirely silent on the subject. *See* Ex. D at 432-47. The parties agree that the default standard of review applies and the Court will review de novo the decision to deny Gonzales the sixth and final monthly benefit. To that extent, the Court grants Plaintiff's motion. The parties expect to settle this issue.

he did not intend to return to work yet because his doctors were trying to determine "why he continues to be fatigued and have dizziness" after the stent operation.[2] AR Ex. C at 86.

On July 3, 2007, Unum acknowledged the receipt of Gonzales' written long-term disability claim and began the initial evaluation. *Id.* at 98. Unum obtained the relevant medical records from the treating physicians. *E.g., id.* at 123-24, 131-32, 209-11 (a May 2007 physician's notes "complaints of intermittent dizziness and mild vision blurriness" as well as "marked fatigue"). The records sent to Unum included Dr. Peter Sacks' diagnosis on July 11, 2007 of very early Parkinson's Disease.[3] *Id.* at 223-24. Dr. Sacks referred Gonzales to a neurologist to confirm whether his symptoms (paucity of facial expression, dizziness, anxiety, unsteady gait, confusion, and difficulty doing his work) were, in fact, indications that he had Parkinson's Disease. *Id.*

Parkinson's Disease is an "age dependent neurodegenerative disorder characterized clinically by resting tremor, rigidity, bradykinesia, gait dysfunction, and postural instability."[4] Robert Campbell, M.D., *Campbell's Psychiatric Dictionary* at 728 (9th ed. 2009). Patients often suffer cognitive dysfunction including impaired memory and slowness of thought. *Id.* at 729. In addition, the patient's "executive functions" are disrupted which negatively impacts the ability to make decisions, to plan and organize, to be flexible in response to changing conditions, and to monitor and inhibit inappropriate

---

[2] During that June 26 conversation, Unum stated that one agent would first handle the STD claim, and that if Gonzales was still disabled in November, then Unum would process his LTD claim. *Id.* at 86. Nonetheless, the administrative record shows that the two insurance companies processed the long-term and short-term claims simultaneously and shared information. AR Ex. E at 209.

[3] Defendants accuse Gonzales of misleading the insurance companies about his medical condition because, in June, he first claimed to be disabled due to his heart condition, but switched horses mid-stream when the insurers relied on the pre-existing condition provision. Defs.' Mot. at 3-4 & n.3. The Court does not discern any such misconduct; instead, the record shows that Gonzales was not diagnosed with Parkinson's Disease until July 2007. *E.g.*, AR Ex. E at PLACLVB 188, 191-92, 203.

[4] The Court declines Plaintiff's request to take judicial notice of the Wikipedia definition of Parkinson's Disease because the internet is not typically a reliable source of information. *See Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d. Cir. 2007); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 782-83 (C.D. Cal. 2004); *In re Poirier*, 346 B.R. 585, 588 (D. Mass. 2006) (refusing to take judicial notice of changing content on webpage). Although Defendants did not object to the reference, the Court prefers a more credible source.

action. *Id.* at 357. "Dementia develops in 20-40% of cases." *Id.* at 729. "Depression occurs in 4-70%, with sleep disturbances, loss of self-esteem, anxiety, and suicidal thoughts." *Id.* (italics omitted).

Gonzales was examined by a neurologist, Dr. Houser, on July 12, 2007. AR Ex. C at 225-228. She confirmed the clinical diagnosis of "mild and very early possible parkinsonism." *Id*. at 228-29. Dr. Houser prescribed medications to treat the symptoms, but explained that the "disease could not be diagnosed with any biomarkers or neuroimaging." *Id.* at 229.

Through the next several months, Unum processed the long-term disability claim and amassed a file exceeding 1,000 pages. *See id.* at 1-1144. Each of Gonzales' treating physicians diagnosed Parkinson's Disease, while Unum maintained there was no evidence of a disability. *Id.* at 92-93, 225-29 (Dr. Houser), 296-97 (Dr. Sacks), 461 & 660-62 (Dr. Johnson) (noting that Gonzales will be permanently disabled).

On January 15, 2008, Unum denied Gonzales' claim for long-term benefits. AR Ex. C at 739-43. Unum denied the claim based on the opinion by a doctor of internal medicine, who had conducted a paper review of the medical records and spoken to Drs. Sacks and Johnson (Gonzales' primary care physician). Unum's expert questioned the accuracy of the neurologist Dr. Houser's diagnosis. *Id.* at 740.

**B.  Unum's Appeal Process**

Gonzales retained counsel, and on March 31, 2008, appealed the denial of benefits. *Id.* at 768. Gonzales provided more recent medical reports, but Unum denied the appeal after in-house and independent doctors reviewed the file and rejected the opinions of the treating doctors. *E.g.*, *id.* at 823-29 (neurologist Dr. Dove diagnoses Parkinson's Disease as well as anxiety, depression, and mild cognitive impairment in July 2008); *id.* at 865-7 (consultant Dr. Topper, a neurologist); *id.* at 921-22 (Unum's in-house Dr. Caruso, a psychiatrist); *id.* at 955 (Unum denial, dated Oct. 30, 2008).

Upon receiving Unum's decision, Gonzales' counsel requested permission to submit additional information from Randy Stotland, PhD, who had recently tested and assessed

1  Gonzales' brain functions to determine if the disease had impacted his executive functions.
2  Unum agreed to consider the new evidence. A dispute then arose between Gonzales'
3  counsel and Unum. Unum contended that it needed Dr. Stotland's raw data while Gonzales
4  requested the names and resumes of the doctors that would review Dr. Stotland's report as
5  well as an opportunity to respond. The impasse was unresolved.

6  Several months passed until Gonzales filed this suit in March 2009. The first cause
7  of action alleged Defendants violated ERISA. The second cause of action was based upon
8  State law; however, the Court determined that it was preempted by ERISA. Doc. No. 42.

9  In their pending motions, the parties dispute, first, whether the insurance policy
10 should be recognized as a plan document that can grant discretion to the plan administrator,
11 and second, whether Unum forfeited its right to rely on that discretion by failing to make a
12 final determination about Dr. Stotland's report, which had been submitted after the appeal.

## DISCUSSION

### A. Principles of Law

Although the motions are styled as Rule 56 motions for summary judgment, "[i]n the ERISA context, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Harlick v. Blue Shield of Cal.*, 656 F.3d 832, 838-39 (9th Cir. 2011) (quoting *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) (internal quotation marks and citation omitted)).

Instead, the district court conducts the analysis set forth in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) to determine whether the default standard of de novo review applies, or instead the more lenient abuse of discretion standard. In *Firestone*, the United States Supreme Court held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard <u>unless</u> the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115 (emphasis added).

A presumption exists that the plan administrator's decision will be reviewed under

the de novo standard. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) ("De novo is the default standard of review."). In adopting the de novo standard, the Supreme Court was guided by principles of trust law because ERISA was enacted to protect employees and the plan administrators have a fiduciary duty to the beneficiaries. *Firestone*, 489 U.S. at 111. "If de novo review applies, . . . [t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie*, 458 F.3d at 963.

The *Firestone* decision, however, left the door open for ERISA plans to be written to expressly delegate discretionary authority to the plan administrator and thereby avoid the de novo standard. When a federal court is asked to review a decision by a plan administrator, the language of the instrument determines whether the authority to interpret the disputed terms of the plan and the power to exercise discretion resides with the "trustee," or in this case, the insurance company. *Firestone*, 489 U.S. at 111-12. Courts must look to the contract to determine if the employee benefits plan gives discretion to the administrator. *Id.* at 112-13. The plan administrator bears the burden of proving that the plan documents grant discretionary authority. *Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991, 994 (9th Cir. 2000). If the ERISA plan uses ambiguous language, they are construed in favor of the participant or beneficiary. *Id.*

If the abuse of discretion standard applies, the court will defer to the administrator's decision unless it is arbitrary, capricious, or made in bad faith. *Conkright v, Frommert*, 130 S. Ct. 1640, 1651 (2010) (the administrator's discretionary interpretation of the plan "will not be disturbed if reasonable") (citation and internal quotation marks omitted); *Oster v. Barco Cal. Employees' Retirement Plan*, 869 F.2d 1215, 1217 (9th Cir. 1988) ("arbitrary or capricious") (footnote and citation omitted); *Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 482 (9th Cir. 1990) (administrator abuses discretion by basing decision on clearly erroneous findings of fact).

"Discretionary clauses are controversial." *Standard Ins. Co. v. Morrison*, 584 F.3d

1  837, 840 (9th Cir. 2009). Critics argue they "may result in insurers engaging in
2  inappropriate claim practices and relying on the discretionary clause as a shield." *Id.*
3  (citation to law review omitted). Consequently, "for a plan to alter the standard of review
4  from the default of de novo to the more lenient abuse of discretion, the plan must
5  unambiguously provide discretion to the administrator." *Abatie*, 458 F.3d at 963 (citing
6  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc)). "There are
7  no 'magic' words that conjure up discretion on the part of the plan administrator." *Id.*
8  (citation omitted). It is sufficient that the ERISA plan grant the administrator the right,
9  duty, and power to determine eligibility for benefits and to construe ambiguous language or
10 interpret plan terms. *Id.* at 963-64 (collecting cases). It is not sufficient if the plan merely
11 identifies the decision-maker and lists its tasks. *Id.* at 964.

12 There are different codicils to the abuse of discretion standard. Depending upon the
13 facts, the court might give less deference to the plan administrator's decision, *see infra*
14 pages 12-14, or conclude that the plan administrator forfeited its right to the lenient abuse
15 of discretion standard.

16 The latter exception is most relevant to the pending motion. Gonzales contends that
17 Unum, by its own misconduct in processing the claim, forfeited its right to the abuse of
18 discretion standard. If proven, the Court would review the disability decision de novo. As
19 the *Abatie* en banc panel explained, "when a decision by an administrator utterly fails to
20 follow applicable procedures, the administrator is not, in fact, exercising discretionary
21 powers under the plan, and its decision should be subject to de novo review." *Abatie*, 458
22 F.3d at 959. This occurs when the plan administrator "flagrantly" violates the claims
23 procedure. *Id.* at 971-72.

24 By comparison, when the administrator mishandles the claim in less serious ways,
25 the abuse of discretion standard will apply, however, the procedural violations "should be
26 factored into the calculus of whether the administrator abused its discretion." *Id.*
27 / / /
28 / / /

**B. Analysis**

    **1. The Plan Documents**

The Court must first determine which documents are part of Starwood's official "plan." *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 75 (1995) (finding specific terms of plan in two documents: the plan constitution and the Summary Plan Description); *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1439 (9th Cir. 1995) (concluding that resolution agreement and letters were not formal plan documents).

"Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(1)(1). "The 'written instrument' requirement is intended to ensure that participants are on notice of the benefits to which they are entitled and their own obligations under the plan." *Wilson v. Moog Auto., Inc. Pension Plan & Trust for U.A.W. Emps.*, 193 F.3d 1004, 1008 (8th Cir. 1999) (citations omitted).

The regulations also require the *employer* to provide its employees with a written "summary plan description" (SPD). 29 C.F.R. § 2520.102-3. "The SPD must be accurate, comprehensive, and understandable to the average participants . . . ." *ERISA: A Comprehensive Primer* § 2.02[A] at 2-4 (Paul Schneider & Brian Pinheiro, eds., 4th ed. 2012). The regulations list the specific information that must be included, but in general, the SPD serves as a disclosure document to communicate the plan provisions to participants. *Id.* at 2-9; AR Ex. A at DEF 103 (defining SPD as "[a] legally required document describing your benefits in detail, how the plan operates, how to file claims, and your rights and responsibilities as a plan participant").

"[A]n employee benefit plan under ERISA can be comprised of more than one document." *Eardman v. Bethlehem Steel Corp. Emp. Welfare Benefit Plans*, 607 F. Supp. 196, 207 (W.D.N.Y. 1984); *Myron v. Trust Co. Bank Long Term Disability Benefit Plan*, 522 F. Supp. 511, 519 (N.D. Ga. 1981) ("the Court has found no authority that states this written instrument must be one all-inclusive document. Indeed the legislative history indicates that Congress contemplated the possibility of more than one writing constituting an ERISA plan."). A plan may incorporate other formal or informal documents, such as a

collective bargaining agreement or a certificate of insurance. *E.g.*, *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 983 (9th Cir. 1997); *Palmiotti v. Metro. Life Ins. Co.*, 423 F. Supp. 2d 288, 291 (S.D.N.Y. 2006) (finding ERISA plan consisted of three documents: "a Master Policy; an LTD Booklet, which includes the Certificate of Insurance; and an Employee Benefits Handbook," where the Master Policy also incorporated additional exhibits and amendments).

Moreover, "there is no requirement that documents claimed to collectively form the employee benefit plan be formally labeled as such." *Horn v. Berdon, Inc. Defined Benefit Pension Plan*, 938 F.2d 125, 127 (9th Cir. 1991).

The Court finds that Starwood's ERISA plan is found in two documents: (1) Starwood's Summary Plan Description (effective April 1, 2005), AR Ex. A, and (2) the group long-term disability insurance policy issued by Unum (No. 574062001), AR Ex. B. "[I]t is clear that an insurance policy may constitute the 'written instrument' of an ERISA plan." *Cinelli*, 61 F.3d at 1441.

Gonzales argues that Unum's insurance policy is not part of "the" plan document. By its own terms, Starwood's SPD states that it is "the plan document," thus, it alone controls the terms of the ERISA Plan. AR Ex. A at DEF 105. Gonzales argues that the use of the singular "the" means that the SPD is the only document that could grant discretionary authority to the administrator. Because it does not, the default de novo standard of review applies. Pl.'s Mot. at 8-9.

The Court is not persuaded by this argument. In a similar case, the Eleventh Circuit faced a SPD document containing two statements that unambiguously "defined itself as 'the plan.'" *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1341-42 (11th Cir. 2006). The employee argued the court could not consider other documents. The Eleventh Circuit was "not convinced that those statements are to be taken as literally as the plaintiffs wish. A more logical understanding of them is that they are merely shorthand explanations of ERISA terms meant to be understood by plan participants and beneficiaries. In any event, neither of these statements precludes consideration of other

1 plan documents." *Id.* at 1343. The *Heffner* court considered other "formally sanctioned"
2 plan documents because the SPD also stated that there were other documents to be
3 considered. That logic applies to this case because here, as there, the SPD acknowledges
4 that Unum's insurance policy is relevant. For example, Starwood's SPD refers to "all plan
5 documents governing the plan" and states that "[t]hese documents may include insurance
6 contracts." AR Ex. A at 115. It also states that "[t]his plan is insurance carrier
7 administered." *Id.* at 116. These passages reveal that Starwood's ERISA Plan
8 contemplated that it would governed by the long-term disability insurance policy issued by
9 the carrier.

10 The SPD in this case also contains a passage that states "[i]f there is any
11 inconsistency between the SPD and the plan document, the plan document governs." *Id.* at
12 113. This self-reference would be hard to reconcile if the SPD and "the" plan document
13 were one and the same. The only reasonable explanation is that Starwood's SPD
14 recognized that the long-term disability benefits would be funded by an insurance policy,
15 and that the terms of that separate document would control the terms. *See CIGNA Corp. v.*
16 *Amara*, 131 S. Ct. 1866, 1878 (2011) (holding that an SPD communicates important
17 information "*about*" the plan, but when the SPD conflicts with the enforceable plan
18 document, statements in the SPD "do not constitute the *terms* of the plan").

19 **2. Language in the Plan Documents**

20 "To assess the applicable standard of review, the starting point is the wording of the
21 plan." *Abatie*, 458 F.3d at 962-63 (citing *Firestone*, 489 U.S. at 111).

22 Starwood's SPD states that "[t]he plan administrator has the authority to control,
23 interpret and manage the operation and administration of each plan," and instructs the
24 employees to contact Unum.[5] AR Ex. A at 116. It also states that the documents

25

26 [5]Gonzales also argues that the SPD is silent on the issue of the administrator's powers.
The Court disagrees as the quoted sentence refers to Unum's *authority to control and interpret*
27 the plan. AR Ex. A at 116. While this statement standing alone might not be sufficient to grant
an administrator discretion to determine eligibility for benefits, it is relevant language. In any
28 event, silence in one document does not create a conflict with language in another plan
document. *Jensen v. SIPCO*, 38 F.3d 945, 952 (8th Cir. 1994). Gonzales relies on an

1  "governing the plan" may include insurance policies. *Id.* at 115.

2  The group insurance policy contains the following paragraph:

3  **DISCRETIONARY ACTS**

4  In exercising its discretionary powers under the Plan [defined elsewhere as the coverage under the policy], the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

9  AR Ex. B at 77. Notably, the term "Plan" in this context refers to the insurance policy. *Id.*

10  at 88 & 80 (defining "Plan").

11  On this record, Unum has met its burden to show that a plan document – the

12  insurance policy – unambiguously delegates the discretion to determine whether an

13  employee is eligible for long-term disability benefits. *Abatie*, 458 F.3d at 963-64; *Salomaa*

14  *v. Honda Long Term Disability Plan*, 642 F.3d 666, 670 n.8 (9th Cir. 2011); *Langois v.*

15  *Metro. Life Ins. Co.*, ___ F. Supp. 2d ___, 2011 WL 6304026 at *2 (N.D. Cal. Dec. 16,

16  2011). The SPD supports this grant of authority by authorizing Unum to interpret the

17  ERISA plan. Accordingly, the Court will conduct an abuse of discretion review to

18  determine whether Unum's denial of long-term disability benefits was unreasonable,

19  illogical, implausible, or without factual support in the record. *Salomma*, 642 F.3d at 675-

20  76.

21  **3. Procedural Errors in the "Second" Appeal**

22  As an alternative argument, Gonzales argues Unum is not entitled to rely on the

23  abuse of discretion standard because it did not exercise its discretion. *Abatie*, 458 F.3d at

24  971-73. Gonzales contends that when Unum told Gonzales' attorney that it was willing to

25  consider new evidence, a "second" appeal process commenced. *See* 29 C.F.R. 2650.503-

26

27  unpublished district court decision. That case is distinguishable because the separate document itself stated it was not incorporated into a plan document. *Besser v. Prudential Life Ins. Co.*,
28  2008 WL 4483796 at *1 (D. Haw. Sept. 30, 2008) (quoting exhibit: "The ERISA Statement is not part of the Group Insurance Certificate.").

1(l); Pl.'s Mot. at 11 (quoting Frequently Asked Questions section of a Department of Labor publication). Unum, however, never ruled on whether Dr. Stotland's assessments would have changed its decision to deny long-term benefits. Gonzales thus equates his situation to the one in *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098 (9th Cir. 2003). In that case, the employee appealed the initial denial but the plan administrator never ruled on the appeal. Both the regulations and the plan document required the administrator to reach a final decision on an appeal within a set time. Because the time limit passed without any decision, the Ninth Circuit applied the de novo standard of review. The Court reasoned that where no discretion was actually exercised, no deference would be given. *Id.* at 1103-06.

This argument fails because Starwood's ERISA plan gave a participant only one chance to appeal. *See* Ex. A at DEF 112 ("If you receive an adverse benefit determination, you may ask for a review."); *cf.* Pl.'s Mot. at 11 (Department of Labor discusses plans that provide for "two levels for review on appeal"). Unum's claims manual states that it may agree to review additional information as a courtesy, but its decision to do so is the opposite of a "wholesale and flagrant violation[] of the procedural requirements of ERISA" that would cause the Court to apply a de novo standard of review. Pl.'s Ex. 4; *Abatie*, 458 F.3d at 971; *Gatti v. Reliance Std. Life Ins. Co.*, 415 F.3d 978 (9th Cir. 2005).

### 4. Other Factors that Impact the Administrator's Exercise of Discretion

That Unum has persuaded the Court that the abuse of discretion standard applies does not end the analysis because the application of the abuse of discretion standard will be impacted by the underlying facts. *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008) (that the plan grants "discretionary authority is only the first step in determining the standard by which we review its denial of benefits). The facts have not yet been developed; however, Gonzales has preliminarily identified some factors that the Court might weigh in deciding "how much or how little to credit the plan administrator's reason for denying coverage." *Abatie*, 458 F.3d at 968.

First, Unum "both determines whether an employee is eligible and pays benefits out

of its own pocket"; consequently, the Court will "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and the significance of the factor will depend upon the circumstances of the particular case." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 111-14 (2008) (citing *Firestone*, 489 U.S. at 111-15); *Salomaa*, 642 F.3d at 675; *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) ("a reviewing court must take into account the administrator's conflict of interest as a factor in the analysis"); *Abatie*, 458 F.3d at 959, 965 (court's abuse of discretion review is "tempered by skepticism commensurate with the plan administrator's conflict of interest" because such "an administrator has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers"); *Prado v. Allied Domecq Spirits & Wine Grp. Disability Income Policy*, 800 F. Supp. 2d 1077, 1095-98 (N.D. Cal. 2011). (considering a lack of effort to limit the impact of a profitmaking motive by hiring independent consultants who continue to practice medicine).[6]

Second, Unum relied on a "paper review." *Montour*, 588 F.3d at 630-31 (case-specific factors "include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of claimant's existing medical records, whether the administrator provided its independent experts with all of the relevant evidence").

Third, Gonzales requested the names of the doctors who would review Dr. Stotland's raw data, but Unum refused. *Prado*, 800 F. Supp. 2d at 1095-98 (considering factors such as the insurer's "marked hostility" to sharing evidence with employee and refusing to promptly identify the names of its reviewing physicians); AR Ex. A at DEF

---

[6] A court may consider evidence outside the administrative record to determine whether the administrator was "plagued" by a profit-making conflict of interest. *Tremain*, 196 F.3d at 976-77; *Abatie*, 458 F.3d at 970. Gonzales suggests Unum has a history of bad faith claims processing. Pl.'s Ex. 10 (California Insurance Commissioner Order); *Saffon*, 522 F.3d at 868 (evidence that administrator has history of parsimoniously granting claims is relevant evidence in determining extent to which the conflict influenced the decision) (citing John H. Langbein, *Trust Law as Regulatory Law*, 101 Nw. U. L. Rev. 1315 (2007) (evaluating the "Unum Provident scandal" – a deliberate program to deny meritorious disability claims)).

1  112. (SPD specifies that applicant has right to request "reasonable access" to records and
2  information relevant to his claim and right to the "identification" of any medical expert
3  "whose advice was obtained in connection with the adverse benefit determination,
4  regardless of whether the advice was relied upon in making the decision.").

5　　　　These are just a sample of the factors that the Court might consider if and when the
6  merits are decided. Thus, while the Court agrees with Defendants that the abuse of
7  discretion standard will apply to Gonzales' long-term disability claim, the precise
8  boundaries of that rule cannot be determined until the parties present their evidence.

### **Conclusion**

10　　　　Having reviewed the briefs prepared by counsel and the relevant cases, the Court
11 GRANTS IN PART AND DENIES IN PART Plaintiff's motion for summary judgment.
12 [# 51] The Court will review the denial of short-term disability benefits using the de novo
13 standard of review. The Court GRANTS Defendants' motion for summary judgment.
14 [# 55] The Court will apply the abuse of discretion standard to review the decision to deny
15 long-term disability benefits.

16　　　　Within seven days of the filing of this Order, the parties must contact Magistrate
17 Judge William V. Gallo to schedule a status conference. At that conference, the Magistrate
18 Judge will issue a scheduling order so that this case can proceed in an orderly and timely
19 fashion. Civ. Local R. 16.1(d). In addition, if the parties are amenable, the Magistrate
20 Judge may, in his discretion, schedule an early settlement conference. *Id.* 16.3(a).

21　　**IT IS SO ORDERED**.

23 DATED: March 22, 2012

　　　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　Hon. Anthony J. Battaglia
　　　　　　　　　　　　　　　　　　　　　　　　　　　　U.S. District Judge